UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONETTA BERRIEN, individually
and as surviving spouse of
CLARENCE BERRIEN, II,

    Plaintiff,

vs                                                    Case No: 08-13359
                                                           Honorable Victoria A. Roberts

UNITED STATES OF AMERICA,

    Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I. Background**

Clarence Berrien II worked for TECOM, an independent contractor hired to perform general maintenance at Selfridge Air National Guard Base. According to Plaintiff's representative, Mr. Berrien went to Selfridge on June 28, 2006 to repair and stain a fence enclosure at the Class VI Liquor Store. Plaintiff says a gutter fell, striking Mr. Berrien on the head. This caused him to fall to the ground and hit his head again. These injuries proved fatal.

Defendant disputes this version of events. It says Mr. Berrien was on a ladder repairing a gutter; he lost his balance and grabbed the gutter for support, pulling it down in the process. Defendant says Mr. Berrien fell, hitting his head on the ground. The Government denies that the gutter hit Mr. Berrien.

No one disputes that a head injury or head injuries caused Mr Berrien's death.

There were no witnesses to this tragic event.

On August 4, 2008, Mr. Berrien's widow filed a complaint under the Federal Tort Claims Act ("FTCA"), 28 USC § 1346(b) for negligence and wrongful death. Mrs. Berrien alleged that Defendant was negligent for failing to: (1) install straps on the gutter (or replace the straps, if they were installed); (2) prevent the gutter from falling; (3) inspect, maintain, and repair the gutter system; (4) properly affix the gutter to the building; and (5) warn business invitees that the gutter was not constructed and/or maintained as required by blueprint specifications.

After considering the Defendant's motion for summary judgment, the Court dismissed all of Mrs. Berrien's claims except her failure to warn claim. On September 15, 2009, the Court held that the claim that Defendant was negligent for failing to warn Mr. Berrien that the gutter was not constructed and/or maintained as required by the blueprint specifications, would proceed to trial.

The parties agreed to submit this matter to the Court for findings and conclusions, under FRCP 52(a), without benefit of trial by stipulation entered on August 23, 2011 and Amended on August 31, 2011.

On November 7, 2011, the following was submitted to the Court for consideration:

       1. Plaintiff's Trial Brief;

       2. Defendant's Trial Brief;

       3. Plaintiff's Reply to Defendant's Trial Brief;

       4. Joint Stipulated Facts;

       5. Plaintiff's Proposed Findings of Fact and Conclusions of Law;

6. Defendant's Proposed Findings of Fact and Conclusions of Law; and

7. Exhibits 1-61.

## II. FINDINGS OF FACT

The Court incorporates the 101 Joint Stipulated Facts submitted by the parties, and makes these additional findings.

### A. What Mr. Berrien Did On June 28, 2006

1. Mr. Berrien was employed by TECOM as a painter, but he also performed carpentry work, building inspections, and other general maintenance work.

2. On June 28, 2006, Mr. Berrien was designated as a painter with TECOM; he began work between 6:00 am and 7:00 am.

3. Mr. Kenneth Parker was Mr. Berrien's supervisor.

4. On June 27, 2006, Mr. Berrien asked Mr. Parker if it would be okay to come in early the next day, to catch up on service orders so that he could attend a doctor's appointment with his wife.

5. Mr. Berrien worked from service orders on June 28, 2006.

6. Mr. Parker found approximately ten service orders in Mr. Berrien's truck after the accident. They all were for paint jobs; staining the garbage enclosure at the liquor store was the top order.

7. The garbage enclosure he was to stain was an approximately 8 foot high cedar fence enclosure at the Class VI Liquor Store.

8. There was no service order in Mr. Berrien's truck to repair any gutter, let alone

one at the Class VI Liquor Store.

9.  Mr. Parker and others saw an 8 foot upright step ladder and fallen gutter when they found Mr. Berrien, and tried to decide if Mr Berrien was doing work on the gutter even though such work was not among his service orders.

10.  Mr. Parker concluded that the ladder was placed in a manner (steps on the wrong side) and too far away from the overhang for Mr. Berrien to have been on it and working on the gutter when it fell and he was injured.

11.  The majority of witnesses on the scene after the accident testified that the ladder was in a position too far from the building for Mr. Berrien to be doing work on the gutter.

12.  It appears that Mr. Berrien was injured before he was able to stain the fence around the garbage enclosure.

### B. The Discovery of Mr. Berrien on June 28, 2006

13.  Shortly before 8:00 am, Nancy Heitzman, the manager of the Class VI Liquor Store, arrived there to open for the day.

14.  Ms. Heitzman parked her car in the parking lot near the back of the building, near the loading space entrance.

15.  The loading space of the Class VI Liquor Store consists of a ground-level cement area, with two rolling garage doors and an employee entrance leading up to the store. This loading area had a small overhang made of metal which extended away from the building.  A gutter was attached to the end of the overhang.

16.  Next to the employee entrance door is a security telephone, which Ms. Heitzman used every morning to call the base police office to request that they disable

the building's security alarm.

17. As Ms. Heitzman approached the building, she observed Mr. Berrien lying on the ground on that cement area.

18. She did not know his name, but she recognized him as a TECOM employee.

19. Ms. Heitzman knelt beside Mr. Berrien and immediately knew that he was severely injured. She called the base police station from the security telephone to request an ambulance.

20. Ms. Heitzman flagged down the driver of a passing TECOM truck, whom was later determined to be Dennis Goral, and told him that a TECOM employee had been hurt.

21. Mr. Goral radioed the TECOM work control number and reported the accident.

22. Mr. Goral stayed with Mr. Berrien until the firefighters arrived to give emergency medical care.

23. Mr. Parker, accompanied by TECOM safety officer Debra Walters, arrived at the scene at approximately the same time as the firefighters.

24. Eventually, the base police and a number of other employees from both TECOM and the Army, came to the Class VI Liquor Store.

25. When he was discovered, Mr. Berrien was lying underneath the metal overhang. The gutter that had previously been attached to the overhang was parallel to Mr. Berrien's prone body, attached to a 2 x 6 board and with a metal downspout attached. The gutter was laying underneath the overhang, between Mr. Berrien and the employee door.

### C. How Was Mr. Berrien Injured?

26. No one witnessed Mr. Berrien's accident.

27. Mr. Berrien was found on the ground with a black line of dirt running across his back.

28. The gutter on the Class VI Liquor Store overhang fell and hit Mr. Berrien in the head, knocking him down.

29. The black line of dirt on his back was debris, i.e., decomposed leaves, from the gutter.

30. When Mr. Berrien was knocked to the ground, it appears he suffered a second blow to the head.

### D. What Caused the Gutter to Fall?

31. Several investigations were conducted into the events surrounding Berrien's accident; no cause was determined.

32. As part of the investigations, architectural blueprints of the Class VI Liquor Store were examined.

33. Following the accident, witnesses saw a 2 x 6 board attached to a gutter on the ground. It apparently had come away from the building's overhang.

34. The original construction blueprints did not show that a board was to be attached to the gutter.

35. The 2 x 6 board was wet and the metal screws or fasteners used to attach it to the building had rusted away.

36. These fasteners used to attach the 2 x 6 and gutter to the beam of the building were interior drywall screws.

37. Interior, regular drywall screws should not be used outside; they will not hold up in the weather and will rust.

38. The gutter was not constructed in accordance with specifications, or original architectural blueprints, in that corrosion-resistant fasteners were not used to attach it to the overhang, as required by the 1990 BOCA National Building Code.

39. Blueprints also suggest that straps were required to hold the gutter in place. None was on this gutter.

40. In these respects, the gutter system deviated from the original architectural blueprints.

41. The gutter fell, in part, because screws holding the 2 x 6 board in place rusted and had deteriorated.

42. The gutter also fell because there were no gutter straps, and the 2 x 6 attached to the gutter was improperly flashed.

43. No evidence was found to support a conclusion that Mr. Berrien fell from a ladder.

### E.  Mr. Berrien's Injuries

44. Mr. Goral assisted Mr. Berrien as soon as he arrived. Mr. Goral testified that Mr. Berrien was on all fours, vomiting, and his eyes protruded.

45. Mr. Berrien moved around after his injury and before he slipped into a coma.

46. There were two impacts to Mr. Berrien's head.

47. There was a frontal fracture of the skull, likely caused by an impact to the skull.

48. Mr. Berrien experienced pain and suffering before he went into a coma.

49. Mr. Berrien was discovered - injured - shortly before 8:00 am, on June 28, 2006, and was in a coma by 8:20 a.m.  He never regained consciousness.

50. Medical examiner records attribute Mr. Berrien's death to "craniocerebral injuries" secondary to "blunt impact to the head."

### F.  Damages

51. Mr. Berrien was just short of 57 years of age at the time of his death, and had a life expectancy of approximately 24 more years.

52. Mr. Berrien is survived by his wife and 18 adult children.

53. Mr. Berrien's wage loss is $530,330 as set forth by Dr. William King, PhD, Plaintiff's expert economist.

54. The total value of Mr. Berrien's lost household services is $127,281, as set forth in Dr. King's report.

55. Mrs. Berrien and the estate should be compensated for the loss of Mr. Berrien for noneconomic and economic damages.

### G. TECOM's Duties Under Its Contract

56. Mr. Richard Lowe was the Business Manager for TECOM and he was the point person for interpretation of the Contract.  He was considered the Contract expert for TECOM.

57. Mr. Lowe worked on this Contract on a daily basis.

58. Mr. Lowe and his supervisors sat down with Mr. Ronald Wesley, the Base Engineer for Selfridge, to figure out the terms, scope, and meaning of the Contract on a regular basis.

59. According to both Mr. Lowe and Mr. Wesley, there was a policy that if

something wasn't broke, TECOM did not need to fix it.

60. The cyclical preventative maintenance inspection TECOM was required to perform every 120 days on the Class VI Liquor Store (which included gutter inspection) did not require it to review construction blueprints and determine if construction was in compliance with blueprints.

61. Under its duty to inspect, TECOM employees were not required to take anything apart to look for code violations.

62. TECOM was not required to remove the gutter to inspect it, and only had to perform a visual inspection.

63. Only when TECOM was authorized to make a repair was it required to bring the object up to code standards.

64. TECOM had no authorization to repair the gutter on June 28, 2006.

### III. Conclusions of Law

### A. Jurisdiction and the Independent Contractor and Discretionary Function Exceptions

1. This is a negligence action against the United States brought pursuant to the FTCA.

2. The FTCA, 28 U.S.C. § 1346(b), provides that federal courts have jurisdiction over claims for damages against the United States for personal injury or death caused by the "negligent . . . act or omission of any employee of the Government while acting within the scope of his . . . employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

3. In cases where "the government is alleged to have committed negligence in the performance of a function such as that performed by a private citizen, rather than in the fulfillment of a broad policy-making duty, the government is subject to suit." *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995).

4. The FTCA defines employee of the government, and excludes from this definition, "any contractor with the United States." 28 U.S.C. § 2671.

5. This is commonly referred to as the independent contractor exception.

6. If the independent contractor exception to the FTCA applies here, the Court is without subject matter jurisdiction. *See Rosebush v. United States*, 119 F.3d 438, 440 (6th Cir. 1997)

7. However, the United States is not insulated from liability for the actions of an independent contractor, if the duty of the United States is non-delegable. *Dickerson v. United States*, 875 F.2d 1577, 1582-84 (11th Cir. 1989).

8. A premises owner can avoid liability where the independent contractor employee comes upon the premises to correct the exact condition that caused the injury. *Nemeth v. Detroit Edison*, 182 N.W.2d 617 (Mich. Ct. App. 1970). However, the United States did not hire TECOM to correct the condition that caused the injury to Mr. Berrien, and TECOM did not create the condition.

9. The United States can be liable for the actions of an independent contractor when the Government is aware that the contractor created a dangerous condition. *Elelwon, Inc. v. U.S.*, 391 F.2d 9, 10-11, 12-13 (5th Cir) cert. denied, 393 U.S. 841 (1968).

10. As discussed below, the United States had constructive notice that a

dangerous condition existed.

11. The independent contractor exception does not apply.

12. Also, the FTCA exempts the United States from liability where the acts of its employees are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

13. This is commonly referred to as the discretionary function exception.

14. The purpose of the discretionary function exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 807-11 (1984).

15. While the decision to build and design a project is a discretionary function, a failure to comply with "technical, scientific, and engineering considerations" is not protected by the discretionary function exception. *Kennewick Irrigation Dist v. United States*, 880 F.2d 1018, 1030-31 (9th Cir. 1989).

16. There is a two part test to determine if the discretionary function applies, as set forth by the Supreme Court in *Berkovitz v. United States,* 486 U.S. 531, 536-539; 100 L.Ed. 2d 531, 108 S. Ct. 1954 (1988). First, the Court must determine if the action complained of is a matter of choice for the government employee. *Id*. at 536. Second, the Court must ask whether the challenged action involved a policy judgment that is meant to protect political, social and economic judgment that is unique to the government's function. *Id.*at 539.

17.  Applying this test, the Court finds it is not met; the decision to follow local building codes is not a matter of choice for government employees.  It is expressly mandated by federal statute, 40 U.S.C. § 3312(b).  Nor is the decision to follow building codes a political, social, or economic judgment unique to the government's function.

18.  Just as the independent contractor exception does not apply, the discretionary function exception does not apply either.

19.  The Court has subject matter jurisdiction.

### B.  Michigan Law Applies

20.  Michigan law governs this premises liability action.  *Mas v. United States,* 984 F.2d 527, 528 (1st Cir. 1983) (the "FTCA directs the District Court to employ local tort law....").

21.  Courts must look to the law of the state where the alleged negligence took place and determine if a private person would be liable, when determining if the United States can be held liable under 28 U.S.C. § 1346.  *Himes v. United States,* 645 F.3d 771, 776-777 (6th Cir. 2011).

22.  In a premise liability action, the Plaintiff must prove the following elements of negligence under Michigan Law:

      1. Defendant owed a duty to Plaintiff;

      2. Defendant breached that duty;

      3. The breach of the duty was the proximate cause of Plaintiff's injury;

      4. Plaintiff suffered damages.

*Benton v. Dart Properties, Inc.*, 715 N.W.2d 335, 338 (Mich. Ct. App. 2006).

### C.  Defendant Owed a Duty to Mr. Berrien

23. The duty that a property owner owes to a plaintiff depends on the plaintiff's status on the land. *Stitt v. Holland Abundant Life Fellowship*, 614 N.W.2d 88, 91 (Mich. 2000).

24. The general rule is that a premises owners' duty of care "extends to invitees who are employees of independent contractors." *Butler v. Ramco-Gershenson, Inc.*, 542 N.W.2d 912, 918 (Mich. Ct. App. 1996).

25. Mr. Berrien was an employee of an independent contractor and was owed Defendant's duty of care.

26. A property owner in Michigan must maintain his or her property in a reasonably safe condition; it has a duty to exercise due care to protect invitees from conditions that might result in an injury. *Torma v. Montgomery Ward & Co.,* 58 N.W.2d 149, 153 (Mich. 1953).

27. The United States owes a duty to an invitee to exercise reasonable care to protect the invitee from an unreasonable risk of harm caused by a dangerous condition on the land. *Lugo v. Ameritech Corp.*, 629 N.W.2d 384, 386 (Mich. 2001).

28. In Michigan, a possessor of land is liable for the injuries of its invitees if: 1) it knows or by the exercise of reasonable care would discover the condition, and should realize the risk is unreasonable; 2) it should expect the invitee will not discover the danger himself; and 3) the possessor fails to exercise reasonable case to protect the invitee against the danger. *Bertrand v. Alan Ford, Inc.*, 537 N.W.2d 185, 186 (Mich. 1995).

### i. Defendant Had Notice Of A Defective Condition

29. A possessor of land is liable for injury resulting from an unsafe condition

caused by the property owner's active negligence, or if the condition is of such a character and it has existed a sufficient length of time that the owner should have knowledge of it. *Hampton v. Waste Management of Michigan, Inc.*, 601 N.W.2d 172, 176 (Mich. Ct. App. 1999).

30. A premises possessor must inspect the premises to discover possible defects. *Kroll v. Katz*, 132 N.W.2d 27, 32 (Mich. 1965).

31. A condition can exist on land or for a sufficient period of time such that a Court can conclude that a possessor of land had constructive knowledge of the condition. *Clark v. Kmart Corp.*, 634 N.W.2d 347, 350 (Mich. 2001).

32. Constructive notice may arise, not only from the passage of time itself, but also from the type of condition involved or from a combination of the two elements. *Banks v. Exxon Mobile Corp.*, 725 N.W.2d 455 (Mich. 2007).

33. It is only where there is no evidence presented to show the defect had existed for considerable time that a defendant is entitled to judgment in its favor. *Whitmore v. Sears, Roebuck & Co.*, 279 N.W.2d 318, 321 (Mich. App. Ct. 1979).

34. It is notice, not actual knowledge, which is required in order to show that the United States knew or should have known of this condition. *Kastle v. Clemons*, 46 N.W.2d 450, 451 (Mich. 1951).

35. This condition of the gutter had existed since 1991 or 1992. The United States has had ample time to become aware of it and was in possession of blueprints which demonstrated noncompliance.

36. The United States had constructive notice of a dangerous condition.

    **ii. Defendant Could Not Have Expected Mr. Berrien Would Discover the**

**Dangerous Condition**

37. Mr. Berrien was at the Class VI Liquor Store to stain a fence. He was not there to fix a gutter. He was not there to even inspect a gutter that day.

38. It was TECOM's responsibility to wait until something stopped functioning before it was required to fix it. Therefore, there would be no reason for TECOM to look at blueprints for the gutter until it actually failed, and no expectation it would discover the defect until the gutter failed.

39. Mr. Berrien would have had no knowledge that the fasteners used to fix the gutter/2 x 6 configuration to the I-beam of the overhand were improper.

40. An invitor is in a better position to control the safety aspects of his property than an invitee. *Bertrand v. Alan Ford, Inc.*, 537 N.W.2d 185, 186 (Mich. 1995). As possessor of property, the United States was in a much better position to discover the defect than Mr. Berrien.

### iii.  Defendant Breached Its Duty by Failing to Warn Mr. Berrien of the Dangerous Condition

41. In Michigan, a possessor of land can breach its duty to protect invitees: (1) by failing to warn of a dangerous condition; (2) through negligent maintenance; and (3) by maintaining a defective physical structure. *Bertrand*, 449 Mich. at 610. See also *Quinlivan v. Great Atlantic and Pacific Tea Co., Inc.,* 235 N.W.2d 732 (Mich. 1975), adopting the Second Restatement of Torts.

42. A premise owner's duty includes a duty to warn of hidden or latent defects. *Riddle v. McClouth Steel Products Corp.*, 45 N.W.2d 676, 682 (Mich. 1992).

43. The United States may be liable, just as any private citizen would be, under

an applicable state tort theory for its own negligence in failing to prevent harm to third parties when the activity contracted for was inherently dangerous or when the Government was aware that the contractor had created a dangerous situation. *Emelwon, Inc. v. United States*, 391 F.2d 9, 10-11, 12-13 (5th Cir. 1968), cert. denied, 393 U.S. 841, 89 S. Ct. 119, 21 L.Ed., 2d 111 (1968).

    44. The United States government is not insulated from liability from an independent contractor's actions if the duty is non-delegable. *Dickerson, Inc. v. United States,* 875 F.2d 1577, 1582-84 (11th Cir. 1989). A property owner/possessor has a non-delegable duty to invitees to warn and repair defects and may not delegate that duty to avoid liability. *Quinlivan v. Great Atlantic and Pacific Tea Co., Inc.*, 235 N.W.2d 732, 743-45 (Mich. 1975).

    45. The United States was required to use a fastener (screw) for preservative treated wood that was weather treated (hot dipped zinc coated galvanized stainless steel silicone, bronze, copper or other corrosion resistant materials as set forth in 40 C.F.R. § 3312(a) and BOCA Building Code § 1702.6.7), to secure the gutter to the building. The United States did not do this. Additionally, it failed to ensure gutter straps were in place.

    46. The United States had a duty to comply with the BOCA Building Code under 40 C.F.R. § 3312, and provide a safe environment for invitees upon the property. The gutter assembly was not constructed in accordance with proper building codes; the United States was required to do so under Federal Law.

    47. The Class VI Liquor Store was not constructed in compliance with one of the nationally recognized building codes, as mandated by 40 U.S.C. § 3312.

48. Failure to construct the building in accordance with proper building codes as required by federal law created an unreasonable risk of harm to invitees.

49. The United States breached its duty by failing to warn Mr. Berrien of the dangerous condition. The United States, as a property possessor, had a non-delegable duty to warn Mr. Berrien of the defect, regardless of whether an independent contractor failed to construct the building properly. It failed to do so.

### D. Causation

50. Defendant's failure to warn Mr. Berrien of the defective construction caused him to be injured when the gutter fell, and led to Mr. Berrien's pain, suffering and death.

### E. Damages

51. Had Mr. Berrien lived, he had a wage expectation of $530,330. His family would have received services from him with a value of $127,281. Mr. Berrien appeared to have conscious pain and suffering for at least 20 minutes before lapsing into a coma. His widow and 18 children are entitled to be compensated for the loss of Mr. Berrien's love, society and companionship.

### F. Contributory Negligence

52. Although Mr. Berrien inspected the gutter and the Class VI Liquor Store on June 9, 2006, he was not required to determine how the gutter was actually attached to the building, or make a decision as to whether it was properly attached.

53. There is no evidence that supports a conclusion that Mr. Berrien was on a ladder when he fell.

54. There is no evidence that supports a conclusion that Mr. Berrien did anything

to cause the gutter to fall.

55. Mr. Berrien did not contribute to his own injuries.

56. There is no evidence that the presence of a birds' nest under the overhang, or the presence of bees, contributed to Mr. Berrien's injuries or death.

### IV.  Conclusion

57. Plaintiff satisfies all the elements of her claim.  The birds and bees defense does not fly.  Plaintiff is entitled to judgment against the United States.  Judgment enters in the amount of $1,181,611.00 together with costs, interest and attorney fees:.

| | |
|---|---|
| Lost wages: | $ 530,330 |
| Loss of services: | $ 127,281 |
| Conscious pain and suffering | $  20,000 |
| Loss of society and companionship for Mrs. Berrien | $  72,000 |
| Loss of society and companionship for each of 18 children (18 x $24,000) | $  432,000 |
| | $1,181.611 |

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  January 13, 2012

---

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 13, 2012.

S/Linda Vertriest
Deputy Clerk